Meyer, J.
(dissenting). The International Monetary Fund (Bretton Woods) Agreement of 1945 (60 US Stat 1401, TIAS 1501) to which the United States and Turkey are signatories, the mandate of section 11 of the Bretton *328 Woods Agreements Act (59 US Stat 516; US Code, tit 22, § 286b) that “the first sentence of article VIII, section 2(b), of the Articles of Agreement of the Fund * * * shall have full force and effect in the United States”, the legislative history of that Congressional enactment,[1] the supremacy clause of the United States Constitution[2] and the decision of the United States Supreme Court in Kolovrat v Oregon (366 US 187) establish beyond peradventure that the applicability of the first sentence of article VIII (§ 2, subd [b])[3] presents a question of Federal not State law. Moreover, although the procedure by which that issue is decided is a matter of State law, the substance of the question “is not to be determined exclusively by the state court”; that phase of the matter the Supreme Court “will review or independently determine” (United States v Pink, 315 US 203, 217).
Thus the correctness of the determination reached by this court on the record before it is subject to further review by the Supreme Court, although the procedural propriety of our review of the Appellate Division’s determination of Turkish law as a matter of law (CPLR 4511, subd [c]), of the use of the materials upon which that determination is based (CPLR 4511, subd [b]) and of the discretion involved in deciding the matter without receiving evidence in addition to the written submissions (CPLR 4511, subd [d]); see Rosman v Trans World Airlines, 34 NY2d 385) is not. Because on the record before the court the determination made is, in my view, incorrect and the courts of this State are bound as a matter of Federal law to apply article VIII *329 (§ 2, subd [b]) of the Bretton Woods Agreement and refuse to enforce the note sued upon, I respectfully dissent.
If article VIII (§ 2, subd [b]) applies, neither the Act of State doctrine referred to by the majority and the Appellate Division nor the intention of the parties to free it from Turkish regulation, relied upon by the Appellate Division, are relevant. The starting point for analysis is rather the Appellate Division’s statement (86 AD2d 544, 545) that “Communique No. 164, under which the note was issued, imposes no conditions on repayment; it simply authorizes issuance of a note payable in foreign currency” and the statement of the majority in this court (pp 325-326) “that defendant has failed to introduce any documentation to support its contention that Turkish law forbids the payment of a promissory note designating that payment shall be made in Swiss francs at a bank incorporated in the United States.” Does the record bear out those conclusions?
Pertinent to that inquiry is CPLR 4511 (subd [b]), which provides that “Every court may take judicial notice without request of * * * the laws of foreign countries” and requires that “Judicial notice shall be taken of matters specified in this subdivision if a party requests it, furnishes the court sufficient information to enable it to comply with the request, and has given each adverse party notice of his intention to request it” (emphasis supplied). Defendant’s cross motion was supported by an affidavit to which was attached a number of Turkish orders and decrees. It asked for summary judgment on the basis of the documentary evidence thus submitted. The court is, under the above-quoted sentence, required therefore to take judicial notice of all of the orders and decrees so submitted. The question, then, is not whether Communique No. 164 in so many words imposed a condition upon payment, but whether the Turkish regulatory system, of which the communique (which is entitled “Communique on Decree No. 17 Regarding Protection of the Value of Turkish Currency”) is but a part, establishes an exchange control regulation within the meaning of article VIII (§ 2, subd [b]) of the agreement.
When the documents are examined together with the affidavit explaining the relationship between them there can be no question but that it does, the more particularly so *330 because plaintiff has submitted no contrary documents or opinions concerning Turkish law. Thus, the Even affidavit annexes Law No. 1567 promulgated in 1930 “regarding protection of the value of Turkish currency,” Law No. 6258 of 1954, which continued and expanded the restrictions upon export of foreign exchange, and Decree No. 17 of 1962, which put all foreign exchange, by whomever owned, at the disposal of the Ministry of Finance and limited spending of exchange to that authorized by the Ministry. The affidavit attaches also copies of Communique Nos. 2, 145 and 164 promulgated pursuant to Decree No. 17 and recounts that through these communiques the CTLD system was established to attract foreign exchange into Turkey through deposits for three years or longer paying very high interest, which, however, were required under Communique No. 145 to be paid over to the Central Bank of Turkey in return for the equivalent in Turkish lira. It attaches as well a copy of plaintiff’s order to its Swiss bank by which it made the deposits that are the consideration for the notes sued upon, which acknowledged that the deposits were made subject to Turkish regulations requiring the Swiss francs to be paid over to the Central Bank of Turkey.
As defined by Decree No. 17 foreign exchange includes all foreign currencies “and instruments of any kind assuring payment in these currencies” and, as already noted, the decree puts all foreign exchange by whomever owned at the disposal of the Ministry of Finance and limits spending of foreign exchange to expenditures authorized by the general or special permission of the Ministry. By decision of the Ministry as relayed to defendant by letter of December 29, 1977, permission to repay principal of CTLDs in foreign exchange was canceled. Clearly, therefore, the documentation accompanying defendant’s cross motion, of which we are required to take judicial notice, establishes that Turkish law forbids the Swiss franc payment for which, by this action on the note, plaintiff sues.
That conclusion does not end the inquiry, however, for there remains the question whether the Bretton Woods Agreement makes the note unenforceable by our courts. The answer must be in the affirmative if (1) payment is contrary to Turkish regulation, (2) the regulation is main *331 tained consistently with the agreement, (3) Turkish currency is involved and (4) the note is an “exchange contract” within the meaning of article VIII (§ 2, subd [b]).
The first three factors are not open to serious question. That the repayment of Swiss francs called for by the note (or the payment of a dollar-equivalent judgment on the note) is contrary to the Turkish regulation is demonstrated beyond question by attachments to the Even affidavit of defendant’s June 26, 1979 request for Ministry permission to pay the notes when due in Swiss francs, the Central Bank’s July 9, 1979 reply advising that the Ministry had denied the request and placed the notes “within the scope of rescheduling” for payment, and of defendant’s September 14, 1979 voucher remitting to Central Bank for remittance to plaintiff the then equivalent in Turkish lira of 500,000 Swiss francs.
Plaintiff suggests that the regulation is not maintained consistently with the agreement because the purpose of the agreement is to promote exchange stability, because article VIII (§ 2, subd [a]) provides that “no member shall, without approval of the Fund, impose restrictions on the making of payments and transfers for current international transactions”, and because paragraph a of section 1 of article IV requires members to avoid manipulating exchange rates in order to prevent effective balance of payment adjustments or to gain an unfair competitive advantage over other members. The argument overlooks the provisions of section 2 of article XIV which permits “restrictions on payments and transfers for current international transactions” during the “post-war transitional period” even though not approved by the fund, and the powers of the fund under section 4 of that article to make representations that such controls be withdrawn, and under section 2 of article XV to compel withdrawal of a member whose regulations offend against the agreement’s provision. Plaintiff presents nothing to suggest that Turkey has violated article IV, to indicate that the Turkish regulation first imposed in 1930 and amended postwar many times is not a permitted transitional period restriction, or indeed that if not such, the restriction has not been *332 approved by the fund. Consistency of the regulation in question may be inferred from the failure of the fund to take any action against Turkey with respect to it, as it had done, for example, in 1954 with respect to Czechoslovakia (Gold, Interpretation By The Fund, p 11), the more so because, despite the offer of the fund {id., at p 7; reprinted at 14 Fed Reg 5208) to advise whether a particular control is consistent, as well as on any other aspect of article VIII (§ 2, subd [b]), plaintiff has presented nothing to establish inconsistency.
There is involvement of Turkish currency, moreover, even though the note in suit is payable in New York in Swiss francs. The note recited that it was issued under Communique No. 164, the title of which is “Communique on Decree No. 17 Regarding Protection of the Value of Turkish Currency” (emphasis supplied), and Weston’s deposit order to its Swiss bank noted the requirement that the Swiss francs be “brought into the republic of turkey according to regulations established by the ministry of finance in turkey whereby the swiss francs have to be paid to the central bank of the republic of turkey.” “Involve” carries such connotations as “entangle”, “implicate”, “embroil”, “connect” and “affect”. Because the purpose of the first sentence of article VIII (§ 2, subd [b]) is to protect the limited controls which the agreement permits by reversing the private law doctrines under which such controls had previously been largely circumvented by the courts, involvement of the currency should be read in terms of the interests of the country whose regulation is in issue rather than of the parties. Moreover, Weston, having paid over its Swiss francs with the understanding that they were destined for the Turkish Central Bank and that the note was governed by a decree protecting Turkish currency, should not be heard to argue that Turkish currency is not affected, implicated or embroiled in the transaction.
A more difficult problem is whether the note is an exchange contract within the meaning of the agreement. I do not blink the fact that Zeevi & Sons v Grindlays Bank
*333 (Uganda) (37 NY2d 220, 229, cert den 423 US 866) held that a “letter of credit is not an exchange contract” and that Banco Do Brasil, S.A. v Israel Commodity Co. (12 NY2d 371, 375-376, cert den 376 US 906) inclined to the view that it would do violence to the text of the section to interpret it as including “all contracts affecting any members’ exchange resources.” The narrow interpretation thus arrived at is, however, inconsistent not only with the more expansive reading given the agreement in Banco Frances e Brasileiro v Doe (36 NY2d 592, cert den 423 US 867) and Perutz v Bohemian Discount Bank in Liquidation (304 NY 533) but also with the conclusion reached by the courts of at least one other State,[4] of courts of other countries which are members of the fund[5] and of commentators.[6] Although there are contrary views the majority view reads “exchange contracts” as used in the agreement, in light of the legislative history of the provision, broadly enough to encompass a transaction based in contract which involves *334 exchange or affects the balance of payments or exchange resources of a member nation.
Because, as the foregoing discussion shows, the note in suit is governed by Turkish regulations and the Bretton Woods Agreement and the Bretton Woods Agreements Act proscribe enforcement of the note by the courts of this State in contravention of those regulations, I would grant defendant’s cross motion for summary judgment dismissing the complaint.
Chief Judge Cooke and Judges Gabrielli, Jones, Wachtler and Fuchsberg concur with Judge Jasen; Judge Meyer dissents and votes to reverse in a separate opinion.
Order affirmed, with costs.

. (Both HR Rep No. 629, 79th Cong, 1st Sess, p 70 [1945] and Sen Rep No. 452,79th Cong, 1st Sess, p 28 [1945] state that: “It also gives effect to that portion of the fund agreement which provides that when other member countries have exchange controls which are consistent with the articles of agreement, United States courts will not enforce exchange contracts that violate such controls.”)

. Clause 2 of article VI: “This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. ”

. “Exchange contracts which involve the currency of any member and which are contrary to the exchange control regulations of that member maintained or imposed consistently with this Agreement shall be unenforceable in the territories of any member.”

. (Confederation Life Assn. v Ugalde, 164 So 2d 1, 3 [Fla], cert den 379 US 915; Crown Life Ins. Co. v Calvo, 164 So 2d 813 [Fla], cert den 379 US 915; Sun Life Assur. Co. of Canada v Klawans, 165 So 2d 166 [Fla]; contra Theye y Ajuria v Pan-Amer. Life Ins. Co., 245 La 755, 766-767, cert den 377 US 997; see Pan-Amer. Lifelns. Co. v Raij, 164 So 2d 204 [Fla], cert den 379 US 920; Blanco v Pan-American Life Ins. Co., 221 F Supp 219, 228-229; see, also, Gold, The Cuban Insurance Cases and the Articles of the Fund and the Paradise article, infra, n 6, discussing the above cases.)

. The other country cases are discussed in Gold, The Fund Agreement in the Courts ([1962], pp 1, 43, 64 and 72); Gold, The Fund Agreement in the Courts (Parts VIII-XI [1976] , pp 9, 28, 50, 73, 87,102,139); Gold, The Fund Agreement in the Courts (Part XII [1977] ); and Gold, The Fund Agreement in the Courts (Part XIV [1979]). From the report and discussion in those articles it appears that though the courts of England originally adopted a broad view of “exchange contract” (Gold [1976], pp 43-50), they now take the narrower view (Gold [Part XII], pp 205-220). However, the broader view is accepted by the highest courts of France (Gold [1962], pp 146,153; Gold [Part XII], p 221), Germany (Gold [1976], pp 78-79), the Netherlands (Gold [1962], p 116), Austria (id., p 90), Luxembourg (id., p 94) and Hong Kong (id., p 87).

. (Baker, Enforcement of Contracts Violating Foreign Exchange Control Laws, 3 Int Trade LJ 247, 273 ff; Gold, op cit, passim; Gold, International Monetary Fund and Private Business Transactions, p 24; Mann, Legal Aspect of Money [4th ed], pp 389, 391; Meyer, Recognition of Exchange Controls After the International Monetary Fund Agreement, 62 Yale LJ 867, 885; Paradise, Cuban Refugee Insureds and the Articles of Agreement of the International Monetary Fund, 18 U of Fla L Rev 29, 55 ff; Pohn, International Law — Court Refuses to Put Export-Import Contract Within Bretton Woods Agreement, 15 Syracuse L Rev 100,102; Williams, Extraterritorial Enforcement of Exchange Control Regulations Under the International Monetary Fund Agreement, 15 Va J Int Law 319, 332 ff; Williams, Enforcement of Foreign Exchange Control Regulations in Domestic Courts, 70 Am J Int L 101, 106, n 31; Williams, Foreign Exchange Control Regulation and the New York Court of Appeals, 9 Cornell Int LJ 239, 243; Note, 63 Col L Rev 1334, 1336.)