## Case No. 412.

### The ANNE.

[1 Mason, 508.][1]

Circuit Court, D. Massachusetts. Oct. Term, 1818.

ADMIRALTY JURISDICTION—PILOTAGE—WRONGDOERS OR MUTINEERS.

1. The admiralty has jurisdiction in personam, as well as in rem, for pilotage earned in piloting ships to, from, or on, the sea.

[Cited in The Wave, Case No. 17,297; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 421.]

[See The Wave v. Hyer, Case No. 17,300; The Alzena 14 Fed. 174; Gottfried v. Miller, 104 U. S. 521; The Wave, Case No. 17,297.]

2. To make pilotage a lien on the ship, the contract must have been made by some person in the employment of the owner, duly authorized to make the contract, such as the master, or the quasi master. But mere wrongdoers or mutineers have no authority to bind the ship.

[Cited in Packard v. The Louisa, Case No. 10,652; Leland v. The Medora, Case No. 8,237; Smith v. The Creole, Case No. 13,032.]

3. Upon the facts, the pilotage in this case, though meritoriously earned, held not to be a charge on the ship.

[4. Cited in The Clatsop Chief, 8 Fed. 163, 767, to the point that a proceeding in rem and in personam cannot be blended in one libel.]

In admiralty. This was a libel [against the Anne, George Manners, claimant,] brought to recover a compensation for piloting the British schooner Anne, from Brown's Bank near the American coast, to Boston. The material facts proved on the trial were shortly these:— The Anne was chartered in June, 1818, at Cork, in Ireland, to proceed from thence to Quebec with passengers. On the 10th of June she sailed from Cork with upwards of sixty passengers on board, ostensibly destined for Quebec. Being obliged to put into Padstow and St. Ives, in consequence of bad weather and some injury done to the vessel, she there dismissed as many passengers as exceeded the number limited by law to be carried out of Great Britain in a vessel of her burden, and again proceeded on her voyage on the 16th day of July. After being out some time, the passengers, amongst whom was a son and daughter of the charterer of the vessel, required of the master, that instead of going to Quebec, he should carry them either to New York or Philadelphia; alleging that they had contracted with the charterer to be landed at one of those ports. The master refusing to comply with their request, on the 17th of August they arose upon him in a body, took the vessel out

[1][Reported by William P. Mason, Esq.]

of his possession, drove him with some violence and threats to the cabin; and having compelled the mate (who was made a defendant in this case) to take an oath, that he would carry the vessel into one of the above-mentioned ports, or into the port of Boston, put him in command. Shortly after this transaction, they began to fall short of provision; and after being upon a very small allowance for many days, and suffering great anxiety from the fear of starving, they fell in at sea with the Reindeer, a small fishing schooner, and obtained from her a supply of provision, and also prevailed upon the libellant, one of her crew, to pilot them into Boston. After arriving there, the mate and crew refused to pay the pilotage, upon the ground that it was a charge against the ship, and the master ought to pay it; and the master refused, alleging that the libellant came on board the Anne at the request of the mate and passengers, who were at that time in command of the vessel; that he made his contract with them, and must now look to them for its fulfilment.

The case was argued by Blake, Dist. Atty., and Blair, for libelant; and W. Sullivan, for claimant.

[Before STORY, Circuit Justice, and DAVIS, District Judge.]

STORY, Circuit Justice. A preliminary exception has been taken to the jurisdiction of the court in this cause, upon the ground, that no suit lies in the admiralty for pilotage, even when the service has been performed on the high seas. It is very true, that the courts of common law have held, (whether rightly in the full extent, is matter with me of extreme doubt) that if the contract be for services to be performed on a navigable river within the body of a county, no suit lies in the admiralty in favor of the pilot for such services. Ross v. Walker, 2 Wils. 264; Abb. Shipp. pt. 2, c. 5, p. 183. And the high court of admiralty, under the imposing authority of prohibitions, has felt itself compelled to follow, with hesitating steps, in the narrow path thus prescribed by the common law. The Eleanor, 6 C. Rob. Adm. 39. But there never has been, as far as I know, a judicial doubt breathed anywhere of the rightful jurisdiction of the admiralty over suits for pilotage on the high seas. And, in point of fact, suits of this nature have been, and are continually entertained by the admiralty. The Nelson, Id. 227. Even in times of the most severe hostility, the courts of common law admitted, that the admiralty had jurisdiction over contracts made upon the sea to be performed upon the sea; and if there ever was a case, which came exactly within the terms of this description, it is the present; for the contract was made upon the sea to pilot the vessel into some port of the United States, she being then at least three days' sail from land. But if this were a perfectly new case, un-

aided by authority, I should still hold that the admiralty had upon principle a rightful jurisdiction, as well in personam as in rem, for pilotage due for services performed on, from, or to the sea; since it properly arises under a maritime contract, and differs in no substantial respect from the contract for mariner's wages. We may, therefore, safely dismiss this objection.

Upon examining the testimony in this case, which is extremely contradictory in many material respects, I cannot say, that the conclusion drawn by the district judge, as to the real state of facts, is not fully warranted by a decisive weight of evidence. Admitting that the original voyage was to Quebec, and not to the United States, it is difficult to resist the impression, that the master did, in common with the passengers, feel the services of the pilot to be very desirable, if not absolutely necessary. And the pilot was noways reluctant in complying with the wishes of the parties, if he could be made perfectly secure of his stipulated pilotage. It cannot be disguised, also, that there is no inconsiderable probability, that the intention of some of the parties, and at least of the charterer, was, that the ostensible voyage to Quebec should terminate in a real voyage to the United States. And the provisions of the statutes of 43 Geo. III. c. 56, and 57 Geo. III. c. 157, restricting British, as well as foreign vessels, to a very small number of passengers, when bound to the United States, and allowing a very large number, when bound to the neighbouring British provinces, afford a very strong color to this supposition. Many circumstances, too, admit of an easy explanation in this way, which would otherwise be wrapt up in marvellous mystery and difficulty. In this view, the supposed mutiny, if not the effect of pre-concert, was not so much at variance with the wishes of any of the parties, as to involve any serious opposition, or inflame any very atrocious passions. The master might not have had any very sincere reluctance to acquiesce in a scheme, which he had no particular interest to oppose, even if he had not been previously consulted, as to the change of destination. To be sure, the case under this aspect involves a meditated fraud upon the British laws. But this court is not at liberty to enforce the municipal regulations of a foreign country, or to take cognizance of any frauds attempted on them. I confess that I have always been a good deal staggered by this doctrine. It has appeared to me more consonant with national comity, sound morals, and public justice, that courts of all countries should lend their aid to discountenance frauds upon the revenue laws of other countries, and decline to enforce any agreements entered into for the purpose of evading those laws. An exception might very properly apply, where those laws were in direct hostility to our own policy or laws, or were inconsistent with the principles of general justice. But the rule is now too stubborn to be controlled, and has been so long established, that it has become almost a formula in our text-books. See Marsh. Ins. bk. 1, c. 3, § 1, and 1 Valin, Comm, art. 49, p. 127; Pothier, Traite D'Assur. note 58; 1 Emerig. 212, 215; Planche v. Fletcher, 1 Doug. 251; Lever v. Fletcher, Park. Ins. (6th Ed.) 313; The Courtney, Edw. Adm. 239; The Leander, Id. 35; The Fortuna, 1 Dod. 81; The Amedie, Id. 84, note. And, indeed, if the contrary doctrine existed, I do not perceive, that it could materially bear on the present case; because there is no pretence to say, that the pilot connived at the supposed mutiny or change of destination; and his services were really beneficial, and rendered bona fide for the common benefit. It was certainly not for him nicely to scan the various rights or duties of the parties; and it would be strange, if services, humanely rendered, were to be treated as crimes, not from any misconduct in the pilot, but from the relief having been afforded to persons, who had brought themselves into distress by their own previous misconduct. I can have no doubt, that the pilot has rendered a meritorious service, and is entitled to a just compensation from some of the parties.

But the principal question remains to be considered, and that is, against whom is the pilotage a rightful charge? The original suit began by a petition in personam against the mate (who at the time of the contract acted as master, the master having been suspended in the command by the asserted mutinous acts of the passengers) and prayed process as well against him as against the ship. Subsequently process was duly issued against the ship; and thereupon the original master, the mate, and the British consul for the owners, severally appeared, and put in a defensive allegation. Whether a proceeding in personam and in rem can be regularly combined, so as to entitle the libellant to a decree in personam, if he fails to establish his claim in rem, need not here be decided; because the parties have, by their own proceedings, waived any question on this head, and confined the ultimate process to the ship only; and if it cannot be maintained against the ship, there must be a dismissal of the present suit.

To make the pilotage a charge on the ship itself, or on the owners, there must be in cases of this nature (for I speak not of pilotage connected with, and forming a part of salvage services) an express or implied contract with the owner, or with his authorized agent. The master is for this purpose an authorized agent; and upon his death or absence the same authority devolves upon the next person properly succeeding to the master in the command of the ship. But it certainly cannot be maintained, upon any acknowledged principles of law, that mere wrongdoers or usurpers of the command of the ship, not acknowledged or appointed by

the owner, can create a lien on the ship, or personally bind the owner by a contract, which they may choose to make, whether it be beneficial to him or not. A fortiori, a criminal usurpation of authority, or a piratical revolt, cannot afford any foundation for a title, which is to bind the ship or owner.

In the cause now before the court, if the transaction is to be taken, as a case of real mutiny, in which the master was forcibly deprived of his lawful authority, and driven from the command of the ship, neither the passengers nor the mate, who succeeded by the appointmen of the passengers as master, had competent authority to enter into any contract binding upon the owner; no more, indeed, than any pirate or roving plunderer upon the ocean. If, on the other hand, it is to be taken as a merely feigned and fictitious proceeding, it becomes material to ascertain whether the master, in point of fact, entered into the contract directly or impliedly on his owner's account. For, if the contract, though for the benefit of the ship, was made by the pilot, under a knowledge of all the circumstances, with other persons on their own personal responsibility, I do not see how, because they have failed to perform it, a resulting security falls on the ship. Now, it is very remarkable, that the evidence, sufficiently discordant in other most important particulars, is uniform in this, that the master utterly refused (no matter, whether in pursuance of a preconcerted plan or not) to be accountable for the pilotage. It is very true, that he seems to have been desirous to retain the pilot; but at the same time he explicitly disavowed any agency in the transaction, and gave full notice, that the pilot was to look, not to him, but to the passengers for his recompense. The passengers did accordingly agree to pay it; and the pilot, trusting to their good faith, and, as I am persuaded, notwithstanding the pretence of violence, noways loth, engaged in the duty. The passengers have abused his confidence, and most disgracefully refused him a recompense, which he justly earned; and if any of them were before the court, I should not hesitate a moment in awarding him, as against them, the fullest compensation. It is no very welcome proof of the morality or gratitude of these emigrants thus landed in safety on our hospitable shores, that they should signalize themselves by a paltry artifice to evade a meritorious debt. But how can the court say, under these circumstances, that a contract explicitly declined (as the libellant himself admits) by the master, who alone had authority to bind the ship, and as explicitly entered into with the passengers, is to be deemed a debt due from the owner? The question is not, whether the owner has been ultimately benefited by the service; but whether he has contracted the debt. It is material also, that the libellant does not in any part of his allegation assert, that any contract was made by the original master; (and if he did, his own testimony would disprove it;) but his claim against the ship is rested on the retainer of the mate, then acting as master. The conduct, too, of the pilot, after the arrival of the Anne in port, evinces in a strong manner his own understanding, that he had no claim on the original master, and consequently no claim through him upon the ship itself. Upon the whole I cannot say, that there is sufficient evidence to warrant me holding, that the pilotage in this case ought to be a lien on the ship; and with the utmost respect for the opinion of the district court, I am compelled to pronounce, that its decree must be reversed. Considering however all the circumstances, I shall direct the reversal to be without costs to either party.

Decree reversed.

---

## ANN, The ELIZABETH.

[See The Elizabeth Ann, Case No. 4,357.]

---

## ANNE. The, (JOHNSON v.)

[See Johnson v. The Anne, Case No. 7,370.]

---

## ANNE, The LUCY.

[See The Lucy Anne, Case No. 8,596.]

---

## ANNE, The MARTHA.

[See The Martha Anne, Case No. 9,146.]

---

## ANNE, The MARY.

[See The Mary Anne, Case No. 9,195.]

---

## ANNESS, (REISSNER v.)

[See Reissner v. Anness, Cases Nos. 11,686, 11,687, and 11,688.]