*595 Jasen, J.
The principal question before us is whether a private foreign bank may avail itself of the New York courts in an action for damages for tortious fraud and deceit and for rescission of currency exchange contracts arising from alleged violations of foreign currency exchange regulations.
Plaintiff, a private Brazilian bank, brings this action for fraud and deceit, and conspiracy to defraud and deceive, against 20 "John Doe” defendants whose identities are unknown to it. The gravamen of plaintiff’s complaint is that these defendants over a period of approximately six weeks participated, in violation of Brazilian currency regulations, in the submission of false applications to Banco-Brasileiro of Brazil, which the plaintiff relied upon, resulting in the improper exchange by the bank of Brazilian cruzeiros into travelers checks in United States dollars totaling $1,024,000. A large amount of the fraudulently obtained travelers checks were deposited by defendant "John Doe No. 1” in an account having a code name of "Alberta” at Bankers Trust Company, New York. Other of such travelers checks were deposited by defendant "John Doe No. 2” in an account having the code name of "Samso” at Manfra Tordella & Brookes, Inc., New York. An order of attachment was granted at Special Term against the property of defendants John Doe No. 1 and John Doe No. 2 held by Bankers Trust and Manfra Tordella & Brookes, Inc. Service of summons by publication was authorized by Special Term.
Subsequent to the granting of the order of attachment and the service of the summons by publication, motions were made by the plaintiff for disclosure from Bankers Trust Co. and Manfra Tordella & Brookes of the true names and addresses of John Doe Nos. 1 and 2 and to direct the attorney for defendant John Doe No. 1 to disclose the true name(s) and address(es) of defendant(s) and the basis of the attorney’s authority to act, or, in the alternative, to vacate his appearance in the action. The defendant John Doe No. 1, by way of order to show cause, moved to vacate the order of attachment, *596 to dismiss plaintiff’s complaint and to intervené in the motion of plaintiff for disclosure from Bankers Trust Co. so as to defend against the disclosure.
Special Term, inter alia, denied the motion to vacate the order of attachment and to dismiss the complaint except as to the third cause of action for damages which was dismissed for failure to plead actual damages. Motions for ancillary relief— for discovery and inspection and for disclosure from the attorney for defendant "John Doe No. 1” of the name and address of his client—were granted.
On cross appeals, the Appellate Division, by a unanimous court (44 AD2d 353), relying on Banco do Brasil v Israel Commodity Co. (12 NY2d 371, cert den 376 US 906), modified by granting defendants’ motion to dismiss the complaint and denying all applications for ancillary relief on the ground that the New York courts were not open to an action arising from a tortious violation of foreign currency regulations.
Plaintiff bank appeals as of right to this court. (CPLR 5601, subd [a].) We are unable to assent to the decision of the Appellate Division and, accordingly, modify the order appealed from by reinstating the order of attachment and the first two causes of action, with leave to plaintiff, if so advised, to apply to Special Term for permission to serve a supplemental pleading alleging special damages in its third cause of action for damages, and by granting the ancillary relief requested to the extent hereafter specified.
It is an old chestnut in conflict of laws that one State does not enforce the revenue laws of another. By way of rationale, an analogy is drawn to foreign penal laws, extrastate enforcement of which is denied (see The Antelope, 10 Wheat [23 US] 66, 123) to deny recognition to foreign tax assessments, judicially expanded also to include foreign currency exchange regulations. The analogy, reformulated in the Restatement (Restatement, Conflict of Laws, §§ 610, 611), but interestingly withdrawn in the Restatement Second (§ 89), traces from Lord Mansfield’s now famous dictum in an international smuggling case that "no country ever takes notice of the revenue laws of another.” (Holman v Johnson, 1 Cowp 341, 343.) But the modern analog of the revenue law rule is justifiable neither precedentially nor analytically.
Holman v Johnson was an action for goods had and received. The plaintiffs, Frenchmen, sold and delivered tea to the defendant in France. The tea was then smuggled into *597 England by the defendant in violation of the revenue laws. In an action for the price, Lord Mansfield’s holding was simply to the effect that a French court would not invalidate a sale of tea by a Frenchman in France made in violation of an English prohibition. The decision was concerned largely with the impact of foreign revenue laws on international commerce, but the quoted dictum became the basis in this country for denying foreign tax authorities the right to collect taxes assessed by them. But certainly that case and earlier (e.g., Boucher v Lawson, 95 Eng Rep 53) and later (e.g., Planché v Fletcher, 1 Dougl 250) dicta in other cases denying extraterritorial effect to forum defenses, should not have been relied upon to deny forum effect to foreign claims.
Nor is the rule analytically justifiable. Indeed, much doubt has been expressed that the reasons advanced for the rule, if ever valid, remain so. (E.g., Leflar, Extrastate Enforcement of Penal and Governmental Claims, 46 Harv L Rev 193.) But inroads have been made. In interstate cases, for example, where the rule made least sense, administrative tax assessments are increasingly equated with tax judgments (Milwaukee County v White Co., 296 US 268) and on that basis generally afforded full faith and credit. (State of Oklahoma ex rel. Oklahoma Tax Comm. v Neely, 225 Ark 230; Ehrenzweig, Conflict of Laws, § 49; but see City of Philadelphia v Cohen, 11 NY2d 401.) Some do consider that, in light of the economic interdependence of all nations, the courts should be receptive even to extranational tax and revenue claims as well, especially where there is a treaty involved, but also without such constraint. (Scoles, Interstate and International Distinctions in Conflict of Laws in the United States, 54 Cal L Rev 1599, 1607-1608.) Indeed, there may be strong policy reasons for specially favoring a foreign revenue regulation, using that term in its broadest sense, especially one involving currency exchange or control.
In the international sphere, cases involving foreign currency exchange regulations represent perhaps the most important aspect of the revenue law rule. This assumes, of course, that a currency exchange regulation, normally not designed for revenue purposes as such, but rather, to prevent the loss of foreign currency which in turn increases the country’s foreign exchange reserves, is properly characterizable as a revenue law. (Contra, Kahler v Midland Bank [1950], A C 24; Dicey, Conflict of Laws [7th ed], p 920.) At any rate, it is for the forum to *598 characterize such a regulation and in this State the question would appear to have been resolved for the present at least by Banco do Brasil v Israel Commodity Co. (12 NY2d 371, 377, cert den 376 US 906, supra).
But even assuming the continuing validity of the revenue law rule and the correctness of the characterization of a currency exchange regulation thereunder, United States membership in the International Monetary Fund (IMF) makes inappropriate the refusal to entertain the instant claim. The view that nothing in article VIII (§ 2, subd [b]) of the Bretton Woods Agreements Act (60 US Stat 1401, 1411)* requires an American court to provide a forum for a private tort remedy, while correct in a literal sense (see Banco do Brasil v Israel Commodity Co., supra, p 376), does not represent the only perspective. Nothing in the agreement prevents an IMF member from aiding, directly or indirectly, a fellow member in making its exchange regulations effective. And United States membership in the IMF makes it impossible to conclude that the currency control laws of other member States are offensive to this State’s public policy so as to preclude suit in tort by a private party. Indeed, conduct reasonably necessary to protect the foreign exchange resources of a country does not offend against international law. (Restatement, 2d, Foreign Relations Law of the United States, § 198, comment b.) Moreover, where a true governmental interest of a friendly nation is involved—and foreign currency reserves are of vital importance to a country plagued by balance of payments difficulties —the national policy of co-operation with Bretton Woods signatories is furthered by providing a State forum for suit.
The Banco do Brasil case relied upon by the Appellate Division is quite distinguishable. There the Government of Brazil, through Banco do Brasil, a government bank, sought redress for violations of its currency exchange regulations incident to a fraudulent coffee export transaction. Here, the plaintiff is a private bank seeking rescission of the fraudulent currency exchange transactions and damages. And no case has come to our attention where a private tort remedy arising *599 from foreign currency regulations has been denied by the forum as an application of the revenue law rule and we decline so to extend the Banco do Brasil rationale. Thus, in the instant case we find no basis for reliance upon the revenue law rule to deny a forum for suit. Moreover, where the parties are private, the "jealous sovereign” rationale is inapposite (cf. Loucks v Standard Oil Co., 224 NY 99, 102-103 [Cardozo, J.]) even as it might seem inapposite in the Banco do Brasil situation where the sovereign itself, or its instrumentality, asks redress and damages in a foreign forum for violation of the sovereign’s currency laws. (But cf. Moore v Mitchell, 30 F2d 600, 603 [L. Hand, J., concurring].)
Perutz v Bohemian Discount Bank in Liquidation (304 NY 533) is consistent with an expansive application of the IMF agreement to which we here ascribe (cf. Kolovrat v Oregon, 366 US 187, 196-198), although there it is true defensive use of foreign currency exchange regulation was made and upheld by this court. But interestingly, in Perutz, in contrast to the instant case, political relations at the time were not conducive to comity which nevertheless was extended.
With regard to the ancillary relief sought—discovery and inspection of Bankers Trust and Manfra Tordella & Brookes— we agree with Special Term that it should be granted to the extent stated by that court. And insofar as disclosure is sought from the attorney for John Doe No. 1 of the true name and address of his client, we conclude that on the record before it Special Term did not abuse its discretion in ordering disclosure. (CPLR 4503; Matter of Kaplan [Blumenfeld], 8 NY2d 214, 218-219.) But that is not to say that in a given situation disclosure might be inappropriate because it is inconsistent with the purpose of representation. Therefore, we would add the caveat that if consistent with his trust and the duty assumed to his client, the attorney for John Doe No. 1 cannot disclose his client’s true identity, his right, alternatively, to withdraw from this case must be recognized.
Finally, subsequent to the commencement of this action, a penalty was levied by the Central Bank of Brazil, and paid by the plaintiff, on account of the álleged fraudulent currency exchange transactions. Therefore, our decision today is without prejudice to a proper application by plaintiff to Special Term to allege by supplemental pleading such sum as an element of special damages on the third cause of action. *600 (CPLR 3025, subd [b]; cf. Morrison v National Broadcasting Co., 19 NY2d 453.)
Accordingly, the order of the Appellate Division should be modified in accordance with the views here expressed and the action remitted to the Supreme Court, New York County.

 There it is provided in relevant part: "Exchange contracts which involve the currency of any member and which are contrary to the exchange control regulations of that member maintained or imposed consistently with this Agreement shall be unenforceable in the territories of any member. In addition, members may, by mutual accord, cooperate in measures for the purpose of making the exchange control regulations of either member more effective”.