The EUROPEAN COMMUNITY,
et al., Plaintiffs,

v.

JAPAN TOBACCO, INC.,
et al., Defendants.

The European Community,
et al., Plaintiffs,

v.

RJR Nabisco, Inc., et al., Defendants.

Department of Amazonas,
et al., Plaintiffs,

v.

Philip Morris Companies, Inc.,
et al., Defendants.

Nos. 02–CV–00164(NGG), 01–CV–05188(NGG), 00–CV–02881(NGG).

United States District Court,
E.D. New York.

Feb. 19, 2002.

### MEMORANDUM AND ORDER

GARAUFIS, District Judge.

Now before this court are motions by RJR Nabisco, Inc., Philip Morris, Inc., Japan Tobacco, Inc., and other tobacco industry entities (the "Defendants") to dismiss the complaints in the above-captioned cases. The complaints have been brought by the European Community, various individual member nations of the European Community, and Departments of the na-

tion of Colombia (the "EC," the "Member States," and the "Departments," respectively, or, together, "Plaintiffs"). Because, for the purposes of these motions, there are no relevant differences among the three above-titled cases, this opinion addresses all three. For the reasons discussed below, Defendants' motions are GRANTED in their entirety.

## Factual & Procedural History

This action stems from a series of cases that have been before this court, discussed in *The European Community v. RJR Nabisco, Inc.,* 150 F.Supp.2d 456, 459–61 (E.D.N.Y.2001) (*"EC I"*). The above-titled cases brought against RJR Nabisco, et al., and against Japan Tobacco, Inc., et al., were brought by the Member States and the EC after *EC I,* where this court found that the EC, the sole plaintiff in *EC I,* lacked standing to bring civil claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.1962, *et seq.* ("RICO"). The claims currently before the court are substantially similar to those of *EC I,* and this court presumes familiarity with the complex factual and procedural background reviewed in that opinion. The following brief factual recitation is taken largely from *EC I.*

Plaintiffs allege, in general terms, that Defendants have been actively involved in smuggling contraband cigarettes into the EC, the Member States, and the Departments, as well as various other locations around the world, for many years; that Defendants' smuggling activities span the globe, and include conduct and effects in the Eastern District of New York; that Defendants entered into an agreement with distributors, customers, agents, consultants and other co-conspirators to participate in a common scheme to smuggle contraband cigarettes into the EC, the Member States, and the Departments; that Defendants conspired with others to promote and conceal their smuggling activ-

ities by means including, *inter alia,* fixing the price of contraband cigarettes; and that in the process of smuggling cigarettes, Defendants engaged the business and services of narcotics traffickers and money launderers, and in so doing facilitated or engaged in the laundering of tainted money. Plaintiffs further allege that, as a result of the foregoing, Plaintiffs have suffered economic harm in the form of lost tax revenues and other costs attributable to rampant illegal activities. Finally, Plaintiffs allege that Defendants agreed with co-conspirators to commit tortious acts, and did in fact commit tortious acts, in conducting the smuggling scheme. Plaintiffs pray for monetary, declarative, and injunctive relief to remedy the foregoing actions.

## Discussion

### I. Standard of Review

In reviewing a motion brought pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences from those allegations in the light most favorable to the plaintiff. *See Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir. 1997). The complaint may be dismissed only if "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hoover v. Ronwin,* 466 U.S. 558, 587, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46; 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In deciding such a motion, the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt,* 79 F.3d 318,

321 (2d Cir.1996) (internal quotation marks and citations omitted).

## II. The Revenue Rule

### A. Introduction

The common law revenue rule was crafted in eighteenth-century England, in a time of intense commercial rivalry between nations. Note, 77 Harv. L.Rev. 1327, 1328 (1964). The English courts crafted the rule in large part because "refusing acknowledgment of a foreign revenue law ... promote[d] British trade that would otherwise have been unlawful." Barbara A. Silver, *Modernizing the Revenue Rule; The Enforcement of Foreign Tax Judgments*, 22 Ga. J. Int'l & Comp. L. 609, 613 (1992). That rationale eventually became more of an embarrassment than a boon to British and American economic and judicial sensibilities. *See The Anne*, 1 F. Cas. 955, 1 Mason 508, 956 No. 412 (C.C.D.Mass.1818) (Story, J.) (attacking the refusal of courts to enforce foreign municipal regulations as contrary to principles of national comity, sound morals, and public justice); Kovatch, *Recognizing Foreign Tax Judgments*, 22 Hous. J. Int'l L. 265, 287–288 (2000). The revenue rule, however, was never expressly overturned, and lived on, albeit in somewhat tempered form. *See Banco Frances e Brasileiro v. Doe*, 36 N.Y.2d 592, 597, 370 N.Y.S.2d 534, 331 N.E.2d 502 (1975) ("[T]he rule [is not] analytically justifiable. Indeed, much doubt has been expressed that the reasons advanced for the rule, if ever valid, remain so. But inroads have been made.")

Case law in this circuit has recognized the great change in conditions under which the revenue rule exists. *United States v. Trapilo*, 130 F.3d 547, 550 n. 4 (2d Cir.1997) ("In an age when virtually all states impose and collect taxes and when instantaneous transfer of assets can be easily arranged, the rationale for not recognizing or enforcing tax judgments is largely obsolete.") (quoting *Restatement (Third) of the Foreign Relations Law of the United States* § 483, Reporters Note 2 at 613 (1987)). To this date, however, the revenue rule has not been overruled, and while times have changed greatly, the revenue rule has not. This court is controlled by a still-vital version of the rule, predicated on considerations of institutional integrity, recently articulated in *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103 (2d Cir.2001) ("*Attorney General of Canada*"). The following discussion is controlled by that decision's treatment of the revenue rule.

### B. The Revenue Rule After *Attorney General of Canada*

#### 1. The Rule

■ The revenue rule provides "that courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns." *Attorney General of Canada*, 268 F.3d at 109. Furthermore, although the Second Circuit, before *Attorney General of Canada*, "ha[d] not ruled on the precise scope of the rule," it is now clear that this Circuit is controlled by "that version of the revenue rule under which United States courts abstain from assisting foreign sovereign plaintiffs with extraterritorial tax enforcement." *Attorney General of Canada* 268 F.3d at 109, 115, 119, 128. Despite the foregoing language, however, this version of the rule is neither a manifestation of standard abstention doctrine, nor an invitation to exercise discretion, as Plaintiffs would have this court understand it. (Pls.' Mem. of Law in Opp'n to Defs.' Mot. Under 12(B)(6) to Dismiss the Am. Compl. For Failure to State a Claim Upon Which Relief Can be Granted at 35–39.) Instead, when triggered, this "time-honored common law prudential rule" will foreclose relief absent an "indication that Congress

intended ... to abrogate the revenue rule."[1] *Attorney General of Canada* 268 F.3d at 106, 129.

## 2. Triggering the Rule

In determining whether the revenue rule is triggered, a court that is "presented with ... a request which potentially implicates the revenue rule" must "examine whether the substance of the claim is, either directly or indirectly, one for tax revenues." *Attorney General of Canada* 268 F.3d at 130. The examination is guided by the Second Circuit's instruction that "[w]hat matters is not the form of the action, but the substance of the claim." *Id.* Where a claim seeks to enforce foreign tax laws, it is of no import that the party bringing the claim does so in compliance with validly enacted United States law, as the revenue rule does not entertain "a formalistic distinction between an action based explicitly and entirely on [foreign] law and one which, in effect, pleads violations of [foreign] law through the medium of a United States statute." *Attorney General of Canada* 268 F.3d at 131, n. 39.

Analysis of whether a claim is a direct claim for foreign tax revenues turns on "the object of the claim." *Id.* If, "at bottom, [a foreign sovereign plaintiff] would have a United States court require defendants to reimburse [the foreign sovereign plaintiff] for [the foreign sovereign's] unpaid taxes," then the claim is a direct one. *Id.* Indirect claims will also run afoul of the revenue rule, and include any claim whereby the damages alleged by plaintiff are derivative of unpaid foreign taxes, or based on the costs of enforcing foreign tax laws. *Id.* at 132. Thus, any action in

which the court "will have to pass on[ ] the validity of [foreign] revenue laws and their applicability [to the claims at bar]" constitutes "enforcing [foreign] revenue laws," and thereby triggers the revenue rule. *Attorney General of Canada* 268 F.3d at 108 (quoting *Attorney General of Canada v. RJ Reynolds Tobacco Holdings, Inc.,* 103 F.Supp.2d 134, 143 (N.D.N.Y.2000)).

## 3. Exceptions to the Rule

 Once the revenue rule is triggered, an action is barred from going forward, with one exception: where the plaintiff can show adequate manifestation of executive or legislative will sufficient to allay the foreign relations and separation of powers concerns underlying the revenue rule, suit may proceed. The exception stems from the fact that the revenue rule derives its continued vitality from foreign relations and separation of powers concerns. *See Attorney General of Canada* 268 F.3d at 115, 119, 125, 126, 128, 132. Thus, the concerns underlying the current version of the revenue rule are satisfied where the proper coordinate branch adequately confers its blessings on jurisdiction. Therefore, in that instance, a court may go forward with suit and pass on foreign revenue laws, despite the revenue rule. As an example, the *Attorney General of Canada* Court indicates that when the United States brings a suit, action will not be barred by the revenue rule. This is because, when the United States brings the action, "the United States Attorney acts in the interest of the United States, and his or her conduct is subject to the

---

1. Although it is not express in *Attorney General of Canada,* this court understands the revenue rule to be a federal rule of common law. The close association with federal and constitutional policy concerns, such as foreign relations and separation of powers, as well as the *Attorney General of Canada* Court's repeated

invocation of *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), indicate to this court that the rule is one of federal common law. *See Attorney General of Canada* 268 F.3d at 109, 112, 114–15, 119, 123, 125–26, 132, 134. The revenue rule thus preempts any conflicting state law.

oversight of the executive branch. Thus, the foreign relations interests of the United States may be accommodated throughout the litigation." *Attorney General of Canada* 268 F.3d at 123.[2]

### 4. Overriding the Rule

Finally, the revenue rule, as a rule of common law, may be abrogated by superior law. A treaty affirmatively conferring jurisdiction over foreign revenue laws in contravention of the revenue rule will supplant the common law rule by virtue of being supreme law of the land.[3] U.S. CONST. art. VI. Validly enacted legislation may also abrogate a common law rule. *City of Milwaukee v. Illinois and Michigan,* 451 U.S. 304, 313–14, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981). "In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *Attorney General of Canada* 268 F.3d at 127 (quoting *United States v. Texas,* 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993)). To do so, a statute must demonstrate "clear evidence of congressional intent to abrogate [the common law rule]." *Attorney General of Canada* 268 F.3d at 127.

## III. Application of the Revenue Rule to the Case at Bar

### A. The RICO claims

■ Plaintiffs bring various RICO claims predicated on two grounds: smuggling and money laundering. In this section of the opinion, the court will consider the RICO claims pursuant to smuggling grounds. The court will consider the claims in light of the money laundering grounds at Part IV of this opinion.

### 1. The RICO Smuggling Claims Trigger the Revenue Rule

Facing a similar set of RICO claims for cigarette smuggling, the trial court in *Attorney General of Canada* held,

> [T]o state a civil RICO claim, Canada must prove more than the mere intent to defraud another of property or the mere establishment of a scheme to defraud utilizing the mails or wire communications in furtherance of that scheme. Again, to have standing to recover, Canada must allege injury in fact, which ultimately obligates it to prove that some act or acts in furtherance of the scheme caused it to sustain injury. *See* 18 U.S.C. § 1964(c); [*Sedima, S.P.L.R. v. Imex Co., Inc.,* 473 U.S. 479, 496, 105

---

**2.** Additionally, the *Attorney General of Canada* Court indicates that litigation may potentially proceed, despite concerns for foreign relations matters, where the executive confers consent. *Attorney General of Canada* 268 F.3d at 123, n. 25 (citing *First Nat'l City Bank v. Banco Nacional de Cuba,* 406 U.S. 759–768–770, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972)). Here, as in *Attorney General of Canada,* "[t]here has been no such expression of consent or approval...." *Id.*

**3.** This court notes that the *Attorney General of Canada* Court examined treaties at some length for the ability of a given treaty scheme to demonstrate general congruence (or the lack thereof) between domestic adjudication of foreign revenue laws and the policy ratio-

nales underlying the revenue rule, rather than for a treaty's clear demonstration of superior law. The *Attorney General of Canada* Court's discussion of treaties, however, occurred under the section of the opinion establishing the continued vitality of the revenue rule, and was designed to reinforce the validity of the policy considerations that ultimately led the court to find for the continued applicability of the revenue rule. This court understands the ultimate ruling in *Attorney General of Canada* to hold that a treaty will only override the revenue rule by virtue of being superior law, and will only adequately effect abrogation with a clear statement of abrogating law. Such a showing has not been made in the case before this court.

S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) ]. This distinction is critical to the outcome of this action.... Thus, to the extent Canada seeks to prove injury to business and property as a result of lost tax revenues and recover therefor, its claims are barred by the Revenue Rule and, therefore, must be dismissed.

*Attorney General of Canada v. RJ Reynolds Tobacco Holdings, Inc.,* 103 F.Supp.2d 134, 142–144 (N.D.N.Y.2000). The Second Circuit supplemented the holding of the District Court with the following:

> To proceed with the law enforcement costs claim, we would have to examine the tax laws at issue in order to assess the causation aspect of this claim. For example, we would have to assess whether the law enforcement costs were in fact spent on achieving the cessation of cigarette smuggling. So doing, we would have to examine whether, when and to what extent the smuggling existed, which would require a determination that tax laws were applicable to defendants. These inquiries could draw the courts into troubled waters.

*Attorney General of Canada,* 268 F.3d at 133.

The present actions involve RICO claims for injury in the form of lost customs duties, lost value added taxes, and lost excise taxes, and also for injury in the form of additional contributions by Member States to the European Community to compensate for tax revenue that the European Community otherwise would have collected. Predicated on smuggling, the claims all clearly implicate the revenue rule in that they would necessarily cause this court to pass on foreign tax laws.

Plaintiffs also bring various RICO claims predicated on harms derivative of smuggling. The injuries include, *inter alia,* loss of funds spent to combat ciga-rette smuggling, and coordinate damage to the security and integrity of Plaintiffs' relevant institutions and markets. Additionally, Plaintiffs seek equitable and injunctive relief designed to impede smuggling, improve future defenses against smuggling, and recoup monies lost to smuggling. All of these claims also trigger the revenue rule under the *Attorney General of Canada* ruling. Here, as there, "we would have to examine whether, when and to what extent the smuggling existed, which would require a determination that tax laws were applicable to defendants." *Attorney General of Canada,* 268 F.3d at 133.

Having triggered the revenue rule, and in order to proceed with their RICO claims predicated on smuggling, Plaintiffs must demonstrate that Congress, in enacting RICO, or in a subsequent amendment to RICO, intended to abrogate the revenue rule. The *Attorney General of Canada* decision, however, states:

> The language and structure of RICO and its legislative history offer no hint that Congress intended the statute to afford a civil remedy to foreign nations for the evasion of foreign taxes. Moreover, there is no language in RICO or in its legislative history that demonstrates any intent by Congress to abrogate the revenue rule. For the statute to change such a time-honored common law prudential rule, it must "speak directly" to the matter; yet it does not. Absent such indication, we must presume Congress understood the common law against which it legislated and intended that this common law doctrine should coexist with the RICO statute.

*Attorney General of Canada,* 268 F.3d at 129. Plaintiffs must overcome the foregoing to state a case under RICO.

### 2. The USA PATRIOT ACT Does Not Abrogate the Revenue Rule Under RICO

#### a. The USA PATRIOT ACT of 2001

■ The *Attorney General of Canada* Court has ruled that RICO, on its face, does not abrogate the revenue rule, and has likewise made clear that, to pursue their RICO claims, Plaintiffs must provide evidence that RICO, as it was enacted by the 91st Congress or affirmatively amended thereafter, statutorily abrogates the common law revenue rule. To demonstrate RICO's abrogation of the revenue rule, Plaintiffs direct the court's attention to legislation, passed subsequent to the *Attorney General of Canada* ruling, titled the "Uniting and Strengthening America By Providing Appropriate Tools Required To Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001", Pub.L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001) (hereinafter, the "Patriot Act"). The Patriot Act was passed in the wake of, and as its name indicates, in response to the events of September 11, 2001.

Section 315 of the Patriot Act amends and expands 18 U.S.C. § 1956(c)(7), a RICO provision that establishes money-laundering as a predicate act. Pub.L. No. 107-56, § 315; or 18 U.S.C. § 1961(1). The Patriot Act's expansion of 18 U.S.C. § 1956(c)(7) on its face does not amend RICO with respect to the revenue rule, and Plaintiffs adduce no other amendment to RICO pertaining to the revenue rule. Thus Plaintiffs rely on the following legislative history, in connection with § 315, to indicate clear abrogation of the revenue rule.

#### b. The Patriot Act's Legislative History

The legislative history in question turns in part on a Rule of Construction that was part of a version of the Patriot Act, H.R. 3004, that passed the House of Representatives on October 17, 2001. The Rule of Construction, however, was subsequently dropped on reconsideration by the House. H.R. 3162. The Rule of Construction would have provided,

> None of the changes or amendments made by the Financial Anti Terrorism Act of 2001 [the former title of the Patriot Act] shall expand the jurisdiction of any Federal or State court over any civil action or claim for monetary damages for the nonpayment of taxes or duties under the revenue laws of a foreign state, or any political subdivision thereof, except as such actions or claims are authorized by United States treaty that provides the United States and its political subdivisions with reciprocal rights to pursue such actions or claims in the courts of the foreign state and its political subdivisions.

147 Cong. Rec. H6924-01 (daily ed. Oct. 17, 2001). The Section by Section analysis of H.R. 3162 noted the deletion with the following: "Dropped provision carving out tobacco companies from RICO liability for foreign excise taxes." 147 Cong. Rec. H7159-03 (daily ed. Oct. 23, 2001). H.R. 3162 passed the House on Oct. 24, 2001. 147 Cong. Rec. H7224-01 (daily ed. Oct. 24, 2001).

Regarding § 315 of the Patriot Act and the deleted Rule of Construction, Representative Wexler, a member of the House Judiciary Committee, stated:

> I am pleased that a provision earlier included in money laundering legislation, which would have inhibited RICO liability for foreign excise taxes for tobacco companies, has been dropped from the USA PATRIOT Act of 2001, the final version of comprehensive anti-terrorism legislation. The sections of the final version of this bill which expand the definition of Specified Unlawful Activities for Money Laundering are a crucial

component of the USA PATRIOT Act. We all know that in order to crush terrorism in all its forms, it will be necessary for us to put an end to the money laundering which is essential to the financing of terrorists' networks. In order for our legislation to be effective, our laws against money laundering must have the widest possible scope. Just as criminals continually are finding new and creative ways to subvert and circumvent our laws, our laws must be broad enough and flexible enough to allow our courts to fight against money laundering in any form we find it. In response to United States requests, many of our allies, including the European Community and its Member States have strengthened their money laundering laws in a cooperative effort to battle money laundering and terrorism. It is our intent to recognize and assist the efforts of our allies in our joint effort to fight fraud and money laundering wherever and in whatever form we find it. If our allies are victimized by fraud, smuggling or money laundering emanating from U.S. soil, they should have the benefit of U.S. laws and U.S. courts to combat those offenses. The expanded definition of Specified Unlawful Activities will ensure that money laundering associated with crimes or fraud committed against our allies shall constitute violations of U.S. law thereby giving the United States and our allies the maximum capability to utilize U.S. law to combat the money laundering. Just as the United States has always recognized the fundamental right of friendly nations to have access to our courts to enforce their rights, we shall continue to give our full cooperation to our allies in their efforts to combat smuggling and money laundering, including access to our courts and the unimpeded benefit of our criminal and civil laws.

147 Cong. Rec. E1936–02 (daily ed. Oct. 29, 2001) (statement of Rep. Wexler).

Plaintiffs also point to the following comments of Senator John F. Kerry, one of the forces behind § 315:

It has been brought to my attention that this bill, as originally passed by the House, contained a rule of construction which could have limited our ability to provide assistance and cooperation to our foreign allies in their battle against money laundering. The House-passed rule of construction could have potentially limited the access of foreign jurisdictions to our courts and could have required them to negotiate a treaty in order to be able to take advantage of our money-laundering laws in their fight against crime and terrorism. The conference report did not include a rule of construction because the Congress has always recognized the fundamental right of friendly nations to have access to our courts to enforce their rights. Foreign jurisdictions have never needed a treaty to have access to our courts. Since some of the money-laundering conducted in the world today also defrauds foreign governments, it would be hostile to the intent of this bill for us to interject into the statute any rule of construction of legislative language which would in any way limit our foreign allies access to our courts to battle against money laundering. That is why we did not include a rule of construction in the conference report. That is why we today clarify that it is the intent of the legislature that our allies will have access to our courts and the use of our laws if they are the victims of smuggling, fraud, money laundering, or terrorism. I make these remarks today because there should be no confusion on this issue and comments made by others should not be construed as a reassertion of this rule of construction which we have soundly rejected. Our allies have

had and must continue to have the benefit of U.S. laws in this fight against money laundering and terrorism.

Smuggling, money laundering, and fraud against our allies are an important part of the schemes by which terrorism is financed. It is essential that our money laundering statutes have appropriate scope so our law enforcement can fight money laundering wherever it is found and in any form it is found. By expanding the definition of "Specified Unlawful Activity" to include a wide range of offenses against friendly nations who are our allies in the war against terrorism, we are confirming that our money laundering statutes prohibit anyone from using the United States as a platform to commit money laundering offenses against foreign jurisdictions in whatever form that they occur. It should be clear that our intention that the money laundering statutes of the United States are intended to insure that all criminals and terrorists cannot circumvent our laws. We shall continue to give our full cooperation to our allies in their efforts to combat smuggling and money laundering, including access to our courts and the unimpeded use of our criminal and civil laws.

147 Cong. Rec. S10990–02 (daily ed. Oct. 25, 2001) (statement of Sen. Kerry).

## c. The Patriot Act Does Not Alter RICO's Treatment of the Revenue Rule

This court acknowledges that the Patriot Act's legislative history offers persuasive evidence that the 107th Congress would not allow the revenue rule to bar civil suit under RICO for injury such as that alleged in the instant case. But Plaintiffs must make more than a showing of what Congress wants or even believes RICO to be. Plaintiffs must adduce legislative history demonstrating that Congress affirmatively acted to statutorily abrogate the revenue

rule with RICO. *Attorney General of Canada,* 268 F.3d at 127–28. The legislative history of the Patriot Act fails to make that showing.

## i. The Legislative History Does Not Effect Abrogation of the Revenue Rule

The removed rule of construction represents the only actual instance of relevant Congressional action. On the strength of the section-by-section analysis and the statements of Senator Kerry and Representative Wexler, Plaintiffs argue that, in removing the clause that would have enshrined the non-abrogation of the revenue rule, Congress effectively amended RICO, causing RICO instead to abrogate the revenue rule. But the removal of the Rule of Construction is simply too slender a reed upon which to effect an abrogation of the revenue rule and a consequent reversal of *Attorney General of Canada.*

The Supreme Court has looked askance on inferring action from inaction, and has stated,

> "Failed legislative proposals are 'a particularly dangerous ground on which to rest an interpretation of a prior statute.'" A bill can be proposed for any number of reasons, and it can be rejected for just as many others. The relationship between the actions and inactions of the 95th Congress and the intent of the 92nd Congress in passing [the legislation at issue] is also considerably attenuated.

*Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers,* 531 U.S. 159, 169–70, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (quoting *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 187, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (quoting *Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990))). In the case at hand, the Second Circuit in *Attor-*

*ney General of Canada* recently stated as a matter of law that RICO does not abrogate the revenue rule. Congress subsequently removed from the Patriot Act a provision which would have statutorily enshrined the *Attorney General of Canada* holding. Regardless of what Congress's negative action may reveal with respect to Congress's feelings about the *Attorney General of Canada* decision, Congress's removal of the provision does not present this court with the sort of authority required by *Attorney General of Canada* to abrogate the revenue rule. Moreover, the legislative history does not present this court with any superior authority adequate to find that the Second Circuit has been reversed as a matter of law.[4]

### ii. The Legislative History Does Not Demonstrate Prior Abrogation of the Revenue Rule

Alternatively, Plaintiffs may be heard to argue that the legislative history demonstrates that Congress intended to abrogate the revenue rule when it passed RICO in 1970. Again, however, Plaintiffs do not present this court with sufficient evidence to find clear abrogation. While the words of Senator Kerry and Representative Wexler are a powerful condemnation of the effects of the revenue rule, this court must consider those comments through the lens of established rules of statutory construction. Two rules of construction limit the weight this court may give to the commentary at hand. First, this court is mindful of the Supreme Court's admonition that "the views of one Congress as to the construction of a statute adopted many years before by another Congress have 'very little, if any, significance.'" *United States v. Southwestern Cable Co.,* 392 U.S. 157, 170, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968) (quoting *Rainwater v. United States,* 356 U.S. 590, 593, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958)). Second, statements by isolated Senators and Representatives are entitled to limited weight in determining the will of the entire law-making body. *Bath Iron Works Corp. v. Director,* 506 U.S. 153, 166, 113 S.Ct. 692, 121 L.Ed.2d 619 (1993); *Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 474, 41 S.Ct. 172, 65 L.Ed. 349 (1921). In light of these two admonitions, this court cannot take the comments of Senator Kerry and Representative Wexler to indicate adequately that the 91st Congress clearly abrogated the revenue rule when it passed RICO, however forceful their belief that it did.

### 3. The RICO Claims Predicated On Smuggling Fail

Plaintiffs have not demonstrated adequate evidence that RICO abrogated the

---

**4.** This court notes that in certain circumstances, negative legislative action will demonstrate sufficient force to effect positive law. *See, e.g., New York Telephone Co. v. New York State Dep't of Labor,* 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) (repeated failure to expressly preempt state power to make policy regarding payments to strikers in the National Labor Relations Act indicated lack of preemption); *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940) (failure to overrule case law extending Sherman Act protections to labor unions indicated legislative endorsement of the case law). As was the case in both *New York Telephone* and *Apex Hosiery,* negative legislative action, when sufficient to effect positive law, com-

monly does so only where the lack of action may be construed as an affirmative legislative decision not to disturb prior law or practice. William Eskridge, Jr., INTERPRETING LEGISLATIVE INACTION, 87 Mich. L.Rev. 67 (1988). Here, among other factors distinguishing the case at bar, the negative legislative action involved a refusal to enshrine a rule identified in the case law. Instead of passively supporting prior law, then, this legislative inaction would actively overrule preexisting law, *i.e., Attorney General of Canada.* To the extent that legislative inaction can make law in this manner, this court demands a considerably greater showing than that called for in standard inaction cases.

revenue rule. Consequently, Plaintiffs' RICO claims predicated on smuggling grounds fail as a matter of law.

## B. The Common Law Claims Predicated On Allegations of Smuggling

As with the RICO claims, the common law claims are predicated on both smuggling and money laundering grounds. In this section of the opinion, the court will consider the claims as they are brought pursuant to smuggling grounds, and will consider the claims as they are brought pursuant to money laundering grounds under Part IV of the opinion.

## 1. The Revenue Rule Applies to Common Law Claims

■ As a rule of common law, the revenue rule applies to common law rights of action. Once triggered, the revenue rule will bar a common law right of action from proceeding, absent an indication in the case law that the right of action is not affected by the revenue rule.

Plaintiffs bring five common law claims: common law fraud, public nuisance, unjust enrichment, negligence, and negligent misrepresentation. Plaintiffs make no showing, and this court finds no demonstration in the case law, that any of these claims are immune to the revenue rule. Consequently, Plaintiffs must satisfy this court that adjudicating the common law claims will not cause this court to pass on foreign revenue laws. Plaintiffs, however, can make no such showing; as discussed, *supra*, adjudication of Defendants' smuggling activities will necessarily cause this court to pass on the applicability of foreign tax laws in making a determination that Defendants in fact engaged in smuggling.

## IV. The Money Laundering Grounds

The court now turns to Plaintiffs' RICO and common law claims predicated on allegations of money laundering.

## A. The RICO Claims

## 1. Plaintiffs Must Adequately Allege Causation Between the Harm and the Underlying Action

■ The Supreme Court has stated that a "plaintiff's right to sue under [18 U.S.C. 1964(c) ] require[s] a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Discussing the *Holmes* standard, the Second Circuit has held, "[t]he test of proximate cause, as we summarized it in *Hecht*, is whether the defendant's acts 'are a substantial factor in the sequence of responsible causation,' and whether 'the injury is reasonably foreseeable or anticipated as a natural consequence.'" *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*, 985 F.2d 102, 104 (2d Cir.1993) (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23–4 (2d Cir. 1990)).

*Holmes* offers three reasons behind the proximate cause threshold:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors.... Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries.... And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of

the problems attendant upon suits by plaintiffs injured more remotely.

*Holmes,* 503 U.S. at 269, 112 S.Ct. 1311.

As discussed below, even under the generous standards for a motion to dismiss, Plaintiffs' complaint fails to meet the proximate cause threshold for the RICO claims predicated on grounds of money laundering.[5]

## 2. The RICO Claims Predicated On Grounds of Money Laundering Do Not Meet the *Holmes* Test

In the complaint before the court, the harm visited on Plaintiffs by Defendants' money laundering is only coherently alleged in concert with the smuggling scheme. On the pleadings, the only apparent connection between the injury asserted and the allegations of money laundering is the harm visited by money laundering as a link in the smuggling chain. As discussed in Part III of this opinion, however, adjudication of the smuggling scheme will require that this court pass impermissibly on the applicability of foreign revenue laws to Defendants' actions. Consequently, the revenue rule bars this court from hearing money laundering claims that, to show harm, will cause this court to adjudicate the smuggling scheme.

Stripped of the harms suffered from smuggling, the complaint offers no additional, distinct causal connection between the allegations of money laundering and the injuries asserted. Simply put, Plaintiffs' complaint attacks a smuggling scheme. The money laundering claims are merely asserted as part of the overarching claims of injury from smuggling. Deprived of that context, Plaintiffs' particular money laundering claims lose all connection to the injuries alleged. While there may yet exist a discreet connection between money laundering and harm suffered by Plaintiffs, this court cannot divine that connection.[6] In sum, where this court is not asked to pass on foreign revenue rules, this court is not presented with the necessary causal connection between Defendants' underlying money laundering actions and the injuries of which Plaintiffs complain.[7]

## B. The Common Law Claims

Plaintiffs bring common law claims for common law fraud, public nuisance, unjust enrichment, negligence, and negligent misrepresentation. The underlying allegations and injuries are identical to those underlying the RICO claims. The common law claims, like the RICO claims, fail for lack of causal connection to the

---

**5.** As Plaintiffs' claims for injunctive relief under RICO are predicated solely on the smuggling grounds, this court does not address the applicability of *Holmes* to application for injunctive relief under RICO.

**6.** Plaintiffs' failure with respect to the money laundering grounds is exacerbated by the vague nature of many of the injuries asserted, *e.g.,* those claims asserting as injury the compromised integrity of Plaintiffs' various institutions and markets. While such broad allegations of injury may be appropriate with respect to a wide-spread smuggling scheme, such allegations simply do not make sense, as presented, in the context of specific claims involving money laundering.

**7.** This finding is supported by analysis of the reasons given in support of the *Holmes* test. With respect to the first reason, to proceed on the money laundering grounds alone, especially in light of the extremely broad injuries alleged, would render proper assessment of damages a likely impossible task. With respect to the second reason given, assigning liability despite the attenuated connection between the money laundering and asserted injuries in the complaint, as it is written, may well expose Defendants to numerous claims stemming from the particular acts. Finally, with respect to the third reason, dismissing these claims will not necessarily deter future claims asserting a cognizable link between Defendants' money laundering activities and consequent injuries.

harm alleged, once the money laundering allegations are removed from the context of the smuggling scheme pursuant to the revenue rule.

### 1. The Legal Standard

To sufficiently assert a right of action under the common law, Plaintiffs must, at the least, establish three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not 'conjectural' or 'hypothetical,'. . . . Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court. . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quotations omitted). Furthermore, "[the *Holmes* proximate causation] principles also apply in general terms to the fraud . . . causes of action asserted by plaintiffs under New York law." *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 242–43 (2d Cir.1999) (citing *Ferguson v. Green Island Contracting Corp.*, 36 N.Y.2d 742, 743, 368 N.Y.S.2d 163, 328 N.E.2d 792 (1975)); *Rockaway Blvd. Wrecking & Lumber Co. v. Raylite Elec. Corp.*, 26 A.D.2d 9, 12, 269 N.Y.S.2d 926 (1st Dep't 1966); *Pulka v. Edelman*, 40 N.Y.2d 781, 785, 390 N.Y.S.2d 393, 358 N.E.2d 1019 (1976).

### 2. The Common Law Claims Predicated On Grounds of Money Laundering Do Not Meet the *Lujan* and *Laborers Local 17* Tests

The underlying allegations of money laundering are identical in Plaintiffs' common law and RICO claims. As discussed above, the money laundering allegations are stripped of their causal connection to Plaintiffs' injuries by this court's inability to adjudicate with respect to the greater smuggling enterprise. Without that causal context, Plaintiffs' common law pleadings meet neither the *Lujan* nor the *Laborers Local 17* standard.

Under *Laborers Local 17*, the common law actions for fraud must meet the heightened *Holmes* test. Here, all of the common law actions are based on the same set of pleadings that failed the *Holmes* test above. Thus, the fraud causes of action—common law fraud, unjust enrichment, and negligent misrepresentation—are ruled out by this court's holding with respect to the RICO claims predicated on money laundering, which claims did not meet the *Holmes* test. *See also Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 316 (1985).

Furthermore, after the revenue rule, the remaining common law claims based on money laundering cannot meet the minimal requirements of *Lujan*, even under the relaxed review of a motion to dismiss.[8] The public nuisance and negligence claims, asserting broad damage remote from isolated money laundering transactions, and without the context of the smuggling scheme, cannot be called fairly traceable to the challenged actions of Defendants.[9] To

---

8. Again, the connection between Plaintiffs' injuries and Defendants' money laundering activities may be adequately clear when viewed in the context of the greater smuggling scheme, but this court may only view the claims independent of claims that will cause this court to pass on foreign revenue rules.

In this more narrow context, as discussed above, the money laundering allegations do not show connection to Plaintiffs' injuries.

9. The same is true of all of Plaintiffs' common law claims based on money laundering. Thus, even if *Laborers Local 17* does not dis-

hold otherwise would essentially put this court in the position of re-pleading Plaintiffs' claims for them. This court, naturally, declines that role.

## Conclusion

For the reasons stated above, Defendants' motions are granted. Plaintiffs' RICO and common law claims predicated on Defendants' smuggling scheme are DISMISSED with prejudice, and Plaintiffs' RICO and common law claims predicated on Defendants' money laundering transactions are DISMISSED without prejudice to replead.

SO ORDERED.

pose of the common law fraud, unjust enrichment, and negligent misrepresentation claims, the claims must still fail as a matter of law.