**THE REPUBLIC OF ECUADOR,**
**Plaintiff,**

v.

**PHILIP MORRIS COMPANIES,**
**INC., et al, Defendant.**

**No. 01–1936–CIV.**

United States District Court,
S.D. Florida.

Feb. 26, 2002.

Thomas Girardi, Esq., Girardi & Keese, Los Angeles, CA, Aaron Podhurst, Joel S. Perwin, Steven C. Marks, Esq., Podhurst, Orsek, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, FL, Walter Lack,

Esq., Engstrom, Lipscomb & Lack, Los Angeles, CA, for The Republic of Ecuador.

Marty Steinberg, Esq., Barry R. Davidson, Esq., Hunton & Williams, Miami, FL, Kenneth J. Parsigian, David R. Zipps, Paul E. Nemser, Goodwin Procter LLP, Boston, MA, Stephen N. Zack, Zack Kosnitzky, P.A., Miami, FL, for Philip Morris Companies, Inc. and Philip Morris Inc.

Douglas J. Chumbley, Carlton Fields, P.A., Miami, FL, William Plesec, Jones, Day, Reavis & Pogue, Cleveland, OH, Laura Parcher, Jones Day, Reavis & Pogue, Washington, DC, for R.J. Reynolds Tobacco Co.

Gene E. Voigts, Richard Gray, Shook, Hardy & Bacon LLP, Kansas City, MI, David Ross, Greenberg Traurig, PA, Miami, FL, for Lorillard Tobacco Co. and Loews Corp.

Kelly Anne Luther, Clark, Silverglate, et al., Miami, FL, Julie Fischer, Kosowitz, Benson, et al., New York, NY, for Liggett Group, Inc., Liggett & Myers, Inc., Brook Group Holding, Inc.

Anthony N. Upshaw, Adorno & Zeder, PA, Miami, FL, for Brown & Williamson Tobacco Corp., BATUS Holdings, Inc.

David Bernick, Jonathan Bunge, Kirkland & Ellis, Chicago, IL, for Brown & Williamson Tobacco Corp., BATUS Holdings, Inc., and American Brands, Inc.

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

MORENO, District Judge.

The Republic of Ecuador brought suit against the tobacco industry alleging Defendants engaged in an international conspiracy to evade taxes by smuggling tobacco products into its territory. At issue is whether this Court can entertain such a lawsuit or whether it must abstain under separation of powers principles. Because this Court finds that it should abstain un-der separation of powers, it dismisses Ecuador's suit.

## I.  FACTUAL BACKGROUND

### A.  Ecuador's Taxing Scheme

Ecuador has imposed several types of levies on tobacco products manufactured in and outside of Ecuador. It has periodically adjusted taxes on tobacco products to influence social policies and to discourage smoking. For example, the complaint indicates that in December 1989, Ecuador imposed a progressive *ad valorem* tax on tobacco products. The progressive rate structure imposed a higher rate on cigarettes made with foreign or imported tobacco and a lower tax rate on the unfiltered domestic brand. This 1989 tax increase is believed to have engendered an increase in smuggling operations designed to avoid tax payments.

### B.  The Alleged Smuggling Schemes

In its amended complaint, Ecuador claims that Defendants sold enormous amounts of Ecuadorian tobacco to a small group of foreign distributors. Allegedly, these distributors used Free Trade Zones in Aruba and Panama to insulate the goods from taxation and then resold the tobacco to smugglers who transported untaxed "black market" tobacco products back into Ecuador. Ecuador also asserts that Defendants participated in a scheme to smuggle foreign grown tobacco into Ecuador without paying taxes. To further their fraudulent scheme, Ecuador claims that Defendants acted in concert with each other and formed a series of "enterprises" within the meaning of the Florida and federal RICO statutes. These enterprises allegedly violated Ecuador's regulatory scheme by illegally selling tobacco products on the Ecuadorian black market. To further these unlawful enterprises, Ecuador alleges Defendants committed numer-

ous acts, including mail and wire fraud. Moreover, Defendants allegedly falsified shipping records, stamps, and labels on packages that Ecuadorian officials inspected.

While Ecuador claims it pursued all smuggling activity with reasonable diligence, it only recently discovered sufficient evidence to bring claims for relief. The delay in discovering the smuggling operations was allegedly caused by Defendants' false and deceptive representations. Ecuador pleads that Defendants, individually and collectively, attempted to prevent detection of their smuggling operation by creating shield companies, circumventing labeling regulations, implicating organized crime as the source of cigarette smuggling, and issuing public statements disavowing responsibility for the smuggling.

### 1. The RJR Defendants' Alleged Smuggling Operations

Particularly, Ecuador alleges that Defendant RJR International set up a subsidiary to remove itself one step from the smugglers. RJR International's Special Markets Division, operating out of Winston–Salem, North Carolina, allegedly oversaw and directed a scheme to avoid taxes from about 1987 until 1992. By the end of 1992, Ecuador alleges that the RJR Defendants made a high-level decision to establish a subsidiary, Defendant Northern Brands International (NBI), to encumber Ecuador's ability to discover the RJR companies' involvement in the smuggling.

Defendant Richard Larocca, while an employee at RJR International, allegedly orchestrated a network to smuggle RJR's tobacco products. Ecuador claims that Larocca and the RJR Defendants, through their use of distributors, ship handlers, and smugglers, established the routes and mechanisms by which cigarettes were smuggled. According to the Ecuadorian government, Larocca provided the RJR

defendants with information regarding efficient smuggling techniques, potential markets for smuggled products, and potential smugglers to effectuate the scheme.

### 2. The Philip Morris Companies' Alleged Smuggling Operations

The amended complaint indicates that Philip Morris engaged in a labrynthine distribution structure to conceal sales and evade taxes. Ecuador alleges that beginning in 1997 the Philip Morris Defendants re-routed cigarette sales through Belgium and Panama. This restructuring allegedly allowed the company to conceal these activities from customs officials.

Ecuador maintains that no documentation was kept in a further effort to conceal the illicit activities. And, to maximize the amount the cigarettes available to be channeled into the smuggling pipeline, the Philip Morris Defendants allegedly supplemented their circuitous distribution scheme with a financing scheme. The financing scheme purportedly allowed the distributors to keep more tobacco products at bay and ready for smuggling than they would otherwise be able to maintain under a cash on delivery system. This plot was allegedly profitable because it allowed the Philip Morris Defendants to maximize the volume of tobacco products for smuggling operations.

In the amended complaint, the Republic of Ecuador references several meetings the Philip Morris Defendants held and plans they developed to conceal as well as enhance smuggling operations. Some of these plans and policies were express, others tacit. All purportedly allowed the Philip Morris Defendants to receive illicit monies and evade valid taxes.

### 3. Other Defendants Alleged Smuggling Operations

Ecuador asserts that other Defendants engaged in a similar process to engage in

and conceal smuggling operations. Allegedly, more than 11,000 pages of documents from Defendants British American Tobacco and Brown & Williamson reveal that the Defendants, collectively and individually, encouraged tax evasion and cigarette smuggling in Ecuador. Defendants, acting in concert, allegedly misrepresented to Plaintiff Ecuador that the "black market" for cigarettes existed because of high taxes. Instead, Ecuador asserts that Defendants' actions to smuggle products caused the Ecuadorian "black market" to emerge. Moreover, Ecuador asserts that the active smuggling operations coupled with their concealment of their complicit behavior caused Ecuador to lose tax revenues from the sale of tobacco.

### C. Ecuador's Claims

Ecuador brings state law common law causes of action for fraud, intentional misrepresentation, conspiracy and concert of action. To relieve these claims, Ecuador asserts that it is entitled to money damages for lost duties and taxes. Additionally, Ecuador asserts causes of action under the Florida RICO statute, § 895.02, *et seq.* and its federal counterpart 18 U.S.C. § 1961, *et seq.* for money damages to compensate for lost duties and taxes, law enforcement costs, treble damages, and injunctive relief.

After removing this action, Defendants moved to dismiss on several grounds. They argue that the revenue rule requires this Court to abstain from adjudicating Ecuador's claims. Because this Court finds this issue is dispositive of Ecuador's claims, the Court need not reach the other grounds for dismissal.

### II. LEGAL STANDARD

A court will not grant a motion to dismiss unless it appears beyond doubt that the plaintiff can prove no facts that would entitle the plaintiff to relief. *See Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Federal Rules of Civil Procedure "do not require a claimant to set out in detail the facts upon which he bases his claim." *Id.* at 47, 78 S.Ct. 99. All that is required is "a short and plain statement of the claim." Fed.R.Civ.P. 8(a)(2). When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *See Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.,* 795 F.2d 948 (11th Cir.1986). The standard on a 12(b)(6) motion is not whether the plaintiff will ultimately prevail in his theories, but whether the allegations are sufficient to allow them to conduct discovery in an attempt to prove allegations. *See Jackam v. Hosp. Corp. of Am. Mideast, Ltd.,* 800 F.2d 1577, 1579 (11th Cir. 1986).

### III. LEGAL ANALYSIS

"But I beg to know, upon what principle it can be contended, that any one department draws from the Constitution greater powers than another, in marking out the limits of the powers of the several departments?" *James Madison,* 1 Annals of Cong. 500 (Joseph Gales ed., 1789).

### 1. The Revenue Rule

■ Separation of powers has led to the creation of judicial doctrines that render certain issues non-justiciable. The act of state doctrine, principles of international comity, and the political question doctrine are among them. The revenue rule is another. This age-old common law doctrine provides that courts of one sovereign will not enforce unadjudicated tax claims of other sovereigns. *See Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,* 268 F.3d 103, 109 (2d Cir.2001); *The European Cmty. v. Japan Tobacco,*

*Inc.,* 186 F.Supp.2d 231, 235 (E.D.N.Y. 2002)(*"European Cmty. II "*). The issue, here, is whether this rule precludes this Court from adjudicating Ecuador's civil RICO and common law claims. It does.

■ Though the complaint is pled under federal and state law causes of action, the substance of the claim is to enforce Ecuadorian tax laws. This is precisely the type of meddling in foreign affairs the revenue rule prohibits. *See Attorney General of Canada,* 268 F.3d at 108 (holding that revenue rule precluded a civil RICO claim brought by Canada to enforce its taxing scheme on several American tobacco companies); *European Cmty. II,* 186 F.Supp.2d at 235, 242 (holding revenue rule barred civil RICO and common law claims).

### A. The Revenue Rule's History and Continued Viability

The revenue rule's origins date to the eighteenth-century English court decisions seeking to protect British trade from the oppressiveness of foreign customs. Formulated in an era of acrimonious commercial competition, the rule was devised to protect a transaction that violated Portugal's export duties. *See Boucher v. Lawson,* 95 Eng. Rep. 53 (K.B.1734) (Lord Hardwicke, C.J.).

The revenue rule also has a longstanding history in the United States. Courts have commented on the rule's importance throughout our history. Judge Learned Hand stated more than seventy years ago:

> Revenue laws ... affect a state in matters as vital to its existence as its criminal laws. No court ought to undertake

an inquiry which it cannot prosecute without determining whether those laws are consonant with its own notions of what is proper.

*Moore v. Mitchell,* 30 F.2d 600, 604 (2d Cir.1929) (L. Hand, J., concurring), *aff'd,* 281 U.S. 18, 50 S.Ct. 175, 74 L.Ed. 673 (1930) (declining to express an opinion on whether a federal court in one state would enforce the revenue laws of another state).[1]

Courts have repeatedly held that a federal court need not give effect to the revenue laws of foreign countries. *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 448, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (White, J. dissenting on other grounds) ("Our courts customarily refuse to enforce the revenue and penal laws of a foreign state, since no country has an obligation to further the governmental interests of a foreign state"); *Her Majesty the Queen in Right of the Province of British Columbia v. Gilbertson,* 597 F.2d 1161, 1165 (9th Cir.1979) ("[I]f the court below was compelled to recognize the tax judgment from a foreign nation, it would have the effect of furthering the governmental interests of a foreign country, something which our courts customarily refuse to do."); *United States v. First Nat'l City Bank,* 321 F.2d 14, 23–24 (2d Cir.1963) ("[i]t has long been a general rule that one sovereignty may not maintain an action in the courts of another state for the collection of a tax claim."). As recently as last year, the Second Circuit recognized the viability of the revenue rule and applied that rule to bar Canada's RICO claim to recoup lost revenue due to alleged smuggling of tobacco products into its territory.

---

1. The Supreme Court later held that states' tax judgments were entitled to full faith and credit in a court of another state. *See Milwaukee County v. M.E. White Co.,* 296 U.S. 268, 56 S.Ct. 229, 80 L.Ed. 220 (1935) (stat-

ing that courts of one state do not have to entertain a suit to recover taxes levied under a foreign state's statute and holding that they must give full faith and credit to *judgments* for taxes entered in another state).

*See Attorney General of Canada,* 268 F.3d at 106.

This Court is persuaded that separation of powers mandates the continued enforcement of the revenue rule. The rationale supporting the revenue rule's viability here is the Constitutional designation of authority to the Executive and Legislative branches to administer foreign relations. *See* U.S. Const. art.I, art. II.[2] Extraterritorial tax enforcement directly implicates relations between the United States and other sovereign nations. *See Attorney General of Canada,* 268 F.3d at 114. As the Second Circuit stated:

> When a foreign nation appears as a plaintiff in our courts seeking enforcement of its revenue laws, the judiciary risks being drawn into issues and disputes of foreign relations policy that are assigned to—and better handled by— the political branches of government.

*Id.; see also INS v. Aguirre–Aguirre,* 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (stating that courts are not responsible for political functions affecting foreign relations); *Sun Oil Co. v. Wortman,* 486 U.S. 717, 740 n. 3, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988) (Brennan, J., concurring) (recognizing continued validity of rule barring adjudication of a foreign tax suit); *United States v. Boots,* 80 F.3d 580, 587 (1st Cir.1996) (applying the revenue rule to reverse conviction for conspiracy to violate Canadian tax laws).

### B. Tax Treaties and the Revenue Rule

The existence of tax treaties is telling. Congress and the Executive have entered several tax treaties on behalf of the United States, but not with Ecuador.[3] U.S. tax treaties typically provide for information exchange and limited collection assistance but not extraterritorial enforcement of tax judgments or claims in U.S. courts. *See Attorney General of Canada,* 268 F.3d at 119. In the absence of a treaty with Ecuador abrogating the revenue rule, this Court cannot disregard it. *See First Nat'l Bank,* 321 F.2d at 21. As the Second Circuit stated:

> Absent an explicit indication to the contrary, there should not be attributed to Congress an intent to give the courts of this nation, in this highly sensitive area of intergovernmental relations, the power to affect rights to property wherever located in the world. The apparent necessity of tax treaties underscores the conclusion that Congress has seen fit to handle this problem in another manner.

*Id.*

Ecuador clings to the argument that the *Attorney General of Canada* decision, where the Second Circuit rejected an almost identical suit by Canada, is limited to its facts because there exists a broad tax treaty between the United States and Canada that occupied the field in that case. The lack of a tax treaty with Ecuador, however, does not lead to the affirmative conclusion that the revenue rule does not apply. In fact, the lack of a treaty is all the more reason why this Court must enforce the revenue rule. Why would Ecuador negotiate a tax treaty with the Executive to recover lost taxes if it could pursue RICO's treble damages in court? An ad-

---

**2.** The President has the power, "with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." U.S. Const. art. II, § 2. Congress regulates "commerce with foreign nations." *Id.,* art. I, § 8, cl. 2.

**3.** There are only five tax treaties in existence where the United States has agreed to provide general assistance in the collection of tax judgments. Soon after the United States entered these treaties, it sought to curtail the availability of courts to render foreign tax collection assistance. *See Attorney General of Canada,* 268 F.3d at 116.

judication of Ecuador's claims would eliminate Ecuador's incentive to negotiate a tax treaty with the Executive. Moreover, such an adjudication would have a direct effect on the bargaining position of the United States vis-à-vis Ecuador in such a negotiation. Possibly, the Executive's ability to secure reciprocity of U.S. tax claims in Ecuador could be undermined if the Judiciary did not adhere to the principal of noninterference. *See Estados Unidos Mexicanos v. DeCoster,* 229 F.3d 332, 340 (1st Cir.2000). As the First Circuit stated:

> Care should be taken not to impinge on the Executive's treaty-making prerogatives or to assume that courts have the institutional competence to perform functions assigned elsewhere in the Constitution.... The Executive often requires, before extending rights to foreign nations, that there be agreements providing for reciprocal protection of American interests.

*Id.* (citations omitted).

Accordingly, this Court disagrees with Ecuador. The lack of a treaty, in this case, does not mean the revenue rule should not be enforced. In fact, the Court finds the opposite to be true and declines to adjudicate Ecuador's claims for injunctive and monetary relief.[4] Had Ecuador entered a treaty with the United States requiring U.S. courts to adjudicate Ecuador's tax claims, this Court would entertain such a suit. *See Attorney General of Canada,* 268 F.3d at 137 (Calabresi, J. dissenting) ("the moment treaties or laws are enacted that provide for the enforcement of certain foreign judgments, the sit-

uation changes. United States courts can thereafter enforce these judgments and must do so."). There is no such directive here.

### C. Does Form Matter?

Ecuador urges this Court to elevate form over substance and draw a formal distinction between an action based entirely on Ecuadorian tax law and one that pleads violations of Ecuadorian law, but asserts a causes of action under United States and Florida law. Such a distinction is unwarranted. As the Second Circuit stated in rejecting an identical argument: "What matters is not the form of the action, but the substance of the claim." *Attorney General of Canada,* 268 F.3d at 130.

Judge Calabresi, in dissent of the *Attorney General of Canada* majority, states "though foreign tax laws cannot be enforced directly, when American law renders an activity—including the violations of foreign tax laws—an American tort or crime, the issues of ... our foreign policy ... disappear." *See Attorney General of Canada,* 268 F.3d at 137. This Court respectfully disagrees. This is not an action brought solely under United States and Florida law, but rather is a claim using United States and Florida law to enforce an unadjudicated Ecuadorian tax claim. Thus, the foreign policy and separation of powers issues do not "disappear." *See Attorney General of Canada,* 268 F.3d at 131. Ecuador's amended complaint directly states that it seeks to recoup actual damages in the amount of lost revenue. If this Court were to require Defendants to

---

4. In *Attorney General of Canada,* the Second Circuit dismissed the claims for equitable on different grounds, stating that there is no cause of action for injunctive relief under RICO. *See Attorney General of Canada,* 268 F.3d at 108. The type of injunctive relief sought in this case includes disgorgement of profits made from alleged tax evasion and

monitoring for compliance with foreign tax laws. This Court does not find that the equitable relief sought differs substantively from the claims for monetary relief—both require this Court to provide relief for lost taxes, whether it be the actual taxes lost or future taxes evaded.

provide Ecuador with relief for lost revenue, that would be an order requiring payment of unpaid taxes, striking at the heart of the revenue rule's purpose. *See Attorney General of Canada,* 268 F.3d at 131.

In its prayer for relief, Ecuador also indicates it seeks to recover the law enforcement costs of investigating and prosecuting this suit. In rejecting an identical claim for law enforcement costs, the Second Circuit stated:

> In effect, Canada is requesting that defendants pay the salary of the tax enforcers; such police costs are thus derivative of the taxes Canada sought to enforce. We do not believe that the mechanism for the enforcement of a tax law can be so easily separated from the tax law itself. It would certainly be anomalous for the Court to permit the collection of the law enforcement costs while holding that the object of those law enforcement efforts was uncollectable. Particularly in light of the separation of powers and foreign relations concerns discussed . . . , we must decline to allow Canada to indirectly enforce its revenue laws simply by pleading tort damages based on the costs of enforcing those laws.

*Attorney General of Canada,* 268 F.3d at 132. This Court agrees. The claim for law enforcement costs to enforce Ecuador's tax laws is derivative of the claim for lost revenue. Accordingly, this Court abstains from adjudicating such a claim under the revenue rule.

▇ In a further attempt to elevate form over substance, Ecuador argues the revenue rule is irrelevant as it is not bringing a cause of action under its own tax laws but under the RICO statutes, to which this Court must give effect. Congress, however, has not abrogated the revenue rule in enacting the RICO statute and the Florida legislature has no authority under the supremacy clause to eradicate a federal common law rule. *See* U.S. Const. art. VI (supremacy clause). Principles of statutory construction require this Court to construe the federal RICO statute as preserving the revenue rule absent clear evidence of Congressional intent to abrogate it. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 108, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). Because the federal RICO statute does not speak directly to the effectiveness of the revenue rule, this Court must give it effect. *See Neder v. United States,* 527 U.S. 1, 21–23, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (interpreting federal RICO statutes to include common law limitations in absence of specific reference to common law doctrine); *Attorney General of Canada,* 268 F.3d at 127–28 (interpreting RICO statute to include revenue rule's limitation and showing Congress' awareness of revenue rule). Accordingly, this Court must read RICO in conjunction with the revenue rule. In doing so, this Court does not read the federal RICO statute to provide a cause of action for a violation of a foreign *tax* law, while it may make violations of other types of foreign laws actionable.[5]

---

**5.** After the Second Circuit handed down the *Attorney General of Canada* decision on October 16, 2001, Congress contemplated and rejected a provision in the USA Patriot Act that would have codified the revenue rule. That Congress rejected that provision, however, does not lead to the affirmative conclusion that the revenue rule is not binding, especially since Congress rejected that provision after the Second Circuit found the rule viable and applied it in *Attorney General of Canada. See*

*European Cmty. II,* 186 F.Supp.2d at 238–42 (discussing at length and holding that Congress' rejection of provision codifying revenue rule did not demonstrate that Congress affirmatively acted to abrogate the rule); *see also* William Eskridge, Jr., *Interpreting Legislative Inaction,* 87 Mich. L.Rev. 67 (1988) (stating that negative legislation action only effects positive law where the lack of action may be construed as an affirmative legislative decision not to disturb prior law or practice).

At bottom, the substance of Ecuador's claims, like Canada's claims, is to directly and indirectly enforce its tax laws and require this U.S. Court to adjudicate a foreign tax claim. Such an adjudication, even if fashioned under civil RICO and common law causes of action, implicates separation of powers. By applying the revenue rule, this Court maintains the integrity of that Constitutional doctrine and allows the political branches to set the parameters of the United States' dealings with Ecuador. Ecuador's proper recourse, therefore, is not in the courts but rather in negotiating a tax treaty with our political branches or adjudicating and enforcing these claims within its own territory.

### D. Civil vs. Criminal RICO—Is there a Distinction?

Ecuador urges this Court to follow two criminal RICO cases from the Second Circuit, where it held abstention under the revenue rule improper. *See generally United States v. Trapilo*, 130 F.3d 547 (2d Cir.1997); *United States v. Pierce*, 224 F.3d 158 (2d Cir.2000). In *Trapilo* and *Pierce*, the Second Circuit held the revenue rule did not bar adjudication of a criminal RICO prosecution. *See Trapilo*, 130 F.3d at 552 (holding that revenue rule did not bar prosecution of a money laundering scheme to defraud the Canadian government of tax revenue); *Pierce*, 224 F.3d at 167–68 (reversing convictions of two *Trapilo* defendants due to U.S. government's failure to establish applicability of Canada's tax laws that the defendants allegedly circumvented).

Implicit in the Second Circuit's holdings is that criminal cases are different lacking the separation of powers issues presented here. In criminal RICO cases, the United States Attorney makes the decision to bring the case. The United States is the plaintiff and the foreign relations goals and policies of the United States can therefore be accommodated in that litigation. Here, there is no such provision for accommodating the interests of the United States. In the civil RICO context, the foreign sovereign plaintiff is seeking to further its own agenda, which may or may not be consistent with that of the United States. *See Attorney General of Canada*, 268 F.3d at 123. Ecuador's interests to eradicate these alleged smuggling operations and recoup lost revenues may or may not be consistent with U.S. foreign policy. But, that is not for this Court to decide. Only the political branches have that authority.[6]

### E. Ecuador's Further Critique of the Revenue Rule

Ecuador relies on *European Cmty. v. RJR Nabisco, Inc.*, 150 F.Supp.2d 456 (E.D.N.Y.2001) (*"European Cmty. I"*) to critique the revenue rule. In dicta, Judge Garaufis criticizes the revenue rule as obsolete and incongruous with other judicial policies. *See id.* at 487. After *Attorney General of Canada*, Judge Garaufis reconsidered this issue in *European Cmty. II*, where he followed the Second Circuit's decision and applied the revenue rule to

Even if Ecuador were to have argued that this Court should construe Congress' rejection of the provision as an abrogation, this Court would not construe it as such because to do so would disturb the status quo set forth in *Attorney General of Canada*. In light of this Court's discussion on the rule's viability and applicability here to protect our separation of powers, this Court will not construe Congress'

rejection of the provision to mean that the rule is not applicable in a RICO suit to recover taxes incurred under Ecuadorian law.

6. Though the Court is persuaded that there is a distinction between civil and criminal RICO, the Court only decides here the applicability of the revenue rule in the civil RICO context.

dismiss the European Community's lawsuit. *See id.*, 186 F.Supp.2d at 235 – 420.

The academic literature has also largely criticized the revenue rule as having little application when the foreign sovereign is the plaintiff in a case. *See* William J. Kovatch, Jr., *Recognizing Foreign Tax Judgments: An Argument for the Revocation of the Revenue Rule*, 22 Hous. J. Int'l L. 265 (2000) (stating that Justice Hand's rationale that the review of foreign tax laws might cause the foreign nation "embarrassment" is outdated rationale when foreign government is plaintiff).[7] To reiterate, this Court is less concerned about "embarrassing" Ecuador and is more concerned with encroaching on Legislative and Executive functions. Even Judge Garaufis conceded in his initial European Community opinion that separation of powers remains a legitimate basis for invoking the rule. *See European Cmty. I*, 150 F.Supp.2d at 477 ("abstention under the revenue rule is never warranted in the absence of genuine separation of powers concerns."); *see also European Cmty. II*, 186 F.Supp.2d at 235 ("the concerns underlying the current version of the revenue rule are satisfied where the proper coordinate branch adequately confers its blessings on jurisdiction.").

Ecuador further criticizes the revenue rule as incongruous with the act of state doctrine. This Court does not find such incongruity. The act of state doctrine precludes U.S. courts from questioning the acts of a foreign sovereign within its own territory. *See Banco Nacional de Cuba*, 376 U.S. at 423–24, 84 S.Ct. 923 (holding that U.S. court was without jurisdiction to adjudicate a contract dispute regarding the Cuban government's expropriation of defendant's sugar). The doctrine traditionally applies when the relief sought or the defense interposed would require a court to declare invalid the official act of a foreign sovereign. *See W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l.*, 493 U.S. 400, 406, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990). The Supreme Court noted the act of state doctrine "arises out of basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations." *Banco Nacional de Cuba*, 376 U.S. at 423, 84 S.Ct. 923. As such, both the act of state doctrine and the revenue rule function to eradicate U.S. courts' involvement in foreign affairs, a function properly left to the political branches of government. *See Attorney General of Canada*, 268 F.3d at 125–26 (reconciling the act of state doctrine with the revenue rule in this fashion). Ecuador asserts that the act of state doctrine requires courts to deem valid the acts of a foreign sovereign taken within its jurisdiction. *See W.S. Kirkpatrick & Co.*, 493 U.S. at 406–09, 110 S.Ct. 701. While this is a correct statement of the law, Ecuador misconstrues this statement to mean that U.S. courts must take affirmative steps to enforce Ecuadorian tax obligations. This the Court cannot do.

---

**7.** Other commentators have wondered why courts do not employ *forum non conveniens* doctrine when the need arises to interpret a foreign tax law rather than invoking the revenue rule. *See* Thomas B. Stoel, Jr., *The Enforcement of Foreign Non-criminal Penal & Revenue Judgments in England & the United States*, 16 Int'l & Comp. L.Q. 663, 671 (1967). While this may be a valid argument in a case where a Defendant can show there is an adequate alternative forum and the private and public factors dictate dismissal in favor of that forum, it is not a valid criticism here. The Court notes the parties' failure to address this issue is indicative that the analysis is inapplicable and Ecuador is not an adequate alternative forum.

In addition, Ecuador asserts that to the extent the revenue rule is viable, it is discretionary. *See European Cmty.*, 150 F.Supp.2d at 476. This Court has recognized that the revenue rule is a rule of abstention, where the Court though possessing jurisdiction may decline to exercise it. Here, the Court reiterates that it declines to exercise jurisdiction because to do so would interfere with the functions of our political branches of government.

Accordingly, this Court declines to extend jurisdiction and adjudicate Ecuador's claims for relief, as such an act would mar separation of powers. This Court does not derive "from the Constitution greater powers than another, in marking out the limits of the powers of the several departments." *James Madison*, 1 Annals. of Cong. 500 (Joseph Gales ed., 1789).

### IV. CONCLUSION

It is,

ADJUDGED that Defendant's Motion to Dismiss is GRANTED. The entire complaint is dismissed with prejudice.